IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br> v.<br><br>JESSE CARTER,<br><br>  Defendant.<br>_____/ | No. CR 09-0444 CRB<br><br>**ORDER RE: SOPHISTICATED MEANS ENHANCEMENT** |

On December 2, 2009, the parties entered into a plea agreement in which the Defendant Jesse Carter agreed to plead guilty to one count of Mail Fraud, in violation of 18 U.S.C. § 1341, and one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1). With respect to sentencing, the parties agreed to a Guidelines calculation, with one exception. They asked this Court to decide whether the two-level "Sophisticated Means" enhancement, *see* U.S.S.G. § 2B1.1(b)(9)(c), should apply.

For the reasons discussed below, this Court finds that the "Sophisticated Means" enhancement applies here. In reaching this finding, the Court relied solely on the facts pled in the plea agreement (and reasonable inferences derived therefrom). The Court did not consider the out-of-court statements made by Carter's co-defendant Cherrie Hokamura or those made by the government's confidential informant.

## DISCUSSION

Section 2B1.1 (b)(9)(C) of the Sentencing Guidelines provides for a two-level enhancement where a defendant employs "sophisticated means" in the execution of a fraudulent scheme. The Guidelines define "sophisticated means" as "especially complex or especially intricate conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(9)(C) n.8 (B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells or offshore financial accounts . . . ordinarily indicates sophisticated means." *Id.*

The Ninth Circuit has held that the enhancement applies where a scheme is "extensively planned and executed with careful attention to detail" and is "more sophisticated than a routine" offense. *United States v. Aragbaye*, 234 F.3d 1101, 1108 (9th Cir. 2000). In *Aragbaye*, for example, the Ninth Circuit upheld the application of the enhancement in a tax evasion case where the defendant (1) obtained a fraudulent taxpayer identification number from the IRS by using a false name and social security number; (2) set up a tax preparation business through which he perpetrated fraud; (3) obtained false W-2 forms from a private company for fictitious employees; (4) opened numerous post office boxes to obtain fraudulent tax refunds; and (5) opened a check-cashing business to deposit the fraudulently obtained refunds. *Id.* The court concluded that Aragbaye's plan was "more complex than the routine tax-evasion case in which a taxpayer reports false information on his 1040 form to avoid paying income taxes." *Id.* (citation and internal quotation marks omitted). It also expressly rejected defendant's argument that "merely using unauthorized social security numbers, filing false tax returns and having tax refund checks mailed to a mail drop [was] not as sophisticated as using 'fictitious entities, corporate shells or offshore bank accounts.'" *Id.*

In this case, the facts stated in the plea agreement establish that Carter's scheme was "extensively planned," "executed with careful attention to detail," and "more sophisticated than a routine" mail fraud or identity theft offense. According to facts pled in the agreement, Carter obtained personal identification information for a large number of individuals (1,279), including their credit card numbers, addresses and dates of birth. Carter also acquired and

2

used a wide array of sophisticated equipment to perpetuate his scheme, including "a credit card embosser, a magnetic coding and reading device, stencils of driver's licenses issued by the State of California, a laminator, black plastic credit cards, a digital camera, black-light lamps, special paints and computer software." This equipment was employed to "create fraudulent driver's licenses and credit cards, and, [notably], to encode stolen personal identification information onto credit card magnetic strips." Carter used the fraudulent documents to "defraud banks and credit-card issuers, by among other things, purchasing pre-paid debit cards with false identifications [and false credit card numbers]." The debit cards were then used to purchase goods and services.

These facts reveal a sophisticated, multi-stage scheme that required extensive planning and attention to detail. Not only did Carter obtain personal information for a large number of individuals, he used sophisticated equipment and tools to create documents of a sufficient quality to defraud numerous banks and credit card issuers. While the creation of false driver's licenses might be somewhat typical, the pressing and magnetic encoding of credit cards is not.[1] Moreover, the fact that Carter used the fraudulently generated credit cards to load-up prepaid debit cards which were then used to purchase goods and services, rather than simply making purchases with the fraudulent credit cards directly, also demonstrates sophistication and an attempt to conceal. In short, like the scheme in *Aragbaye*, Carter's scheme involved multiple layers of fraud, multiple private entities, and multiple instances of unlawful behavior. It qualifies as a scheme executed by "sophisticated means." *See also United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006) (noting that "[e]ven if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme.").

Carter makes three arguments in opposition to a finding that the "sophisticated means" enhancement applies. None of these is persuasive.

---

[1] The Court notes that the driver's licenses produced by Carter (and introduced by the government at Carter's sentencing hearing, without objection from Carter), were of a very high quality and included such sophisticated details as an invisible outline of the California bear that was visible only under "blacklight." Thus, even the driver's licenses created by Carter demonstrate significant "attention to detail."

3

1   First, Carter maintains that the manner in which he committed his crime was "as easy
2   as having access to the internet." Def's Sentencing Memo at 5. This argument is belied by
3   the fact that Carter's scheme involved the theft of private data, the use of several pieces of
4   advanced equipment, the physical stamping and encoding of false documents and credit
5   cards, and the presentation of those documents to banks, credit card issuers, and retailers.
6   Carter's scheme involved more than the simple use of the internet.

7   Second, Carter contends that he possessed a large quantity of machinery and raw
8   materials because "he had to make twenty [credit cards] to get one 'right.'" *Id.* at 4-5. In
9   Carter's view, this fact demonstrates that his plan lacked sophistication. To the contrary,
10  Carter's assertion that he had to make several cards to get one right further demonstrates that
11  "careful attention to detail" was required to execute his scheme successfully.

12  Finally, Carter asserts that his plan could not have been sophisticated because he
13  suffers from a serious methamphetamine addiction. Although the Court finds that Carter
14  does have such an addiction, it fails to see how that addiction renders Carter's scheme any
15  less sophisticated. It is undisputed that Carter executed the complicated scheme described
16  above. Whether he did so while under the influence of drugs is simply not relevant to a
17  determination of whether the objective means used to conduct the scheme were or were not
18  sophisticated.

19  In sum, the facts provided in the plea agreement establish that Carter executed a
20  sophisticated, multi-layered scheme that involved the repeated use of advanced equipment to
21  defraud multiple entities. The Court therefore finds that the "Sophisticated Means"
22  enhancement applies here.

23  **IT IS SO ORDERED.**

25  Dated: April 5, 2010               CHARLES R. BREYER
                                       UNITED STATES DISTRICT JUDGE